UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

TERRANCE RAYFORD,

               Petitioner,                       **DECISION AND ORDER**
–vs-                                                         No. 02-CV-0811(VEB)

GARY GREENE,

               Respondent.

---

## INTRODUCTION

*Pro se* petitioner Terrance Rayford ("Rayford" or "petitioner") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The parties have consented to disposition of this matter by a magistrate judge pursuant to 28 U.S.C. § 636(c).

Rayford is currently incarcerated as a result of his conviction on September 30, 1999, on various drug charges, for which he received an indeterminate sentence of 5 to 10 years after being adjudicated as a second felony offender.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On September 3, 1998, Officer Andrew Santell ("Santell") of the Rochester Police Department was assigned to attempt an undercover purchase of cocaine from an apartment building located at 247 Meigs Street. At about 1:16 a.m., Santell, wearing a body wire and dressed in street clothes, approached 247 Meigs Street, opened the outer door of the house, and knocked on the second, inner door. T.186-87, 189-91.[1]  This door contained a glass pane through

---

[1]    Citations to "T.__" refer to the transcript of Rayford's trial transcript.

which Santell could see but not clearly. Moments later, a black male, later identified as Rayford, stepped into the area where Santell was standing. Santell testified that they were about two to three feet away from each other. Santell was able to clearly see the man because the light from the streetlamp across the street from the house and the light that was on inside the vestibule behind the inner door. Santell, who had experience conducting buy-and-bust drug transactions, testified that he concentrated on the man's face during the encounter, which took about a minute and a half. T.195-96.

When Rayford appeared, Santell asked for two "dime bags" (i.e., ten-dollar bags of cocaine). Rayford walked back through the inner door and closed it; Santell observed him walk about five to ten feet away from the door, bend down, and then return to the inner door. Rayford opened the inner door and handed Santell two dime bags of a white, powdery substance later determined to be cocaine, for which Santell paid in pre-recorded buy money. T.193-94. Santell took the bags and walked away, broadcasting a description of the man who had sold him the drugs–a six-foot-tall black male wearing a green shirt and black nylon pants. T.195-96.

As the "take-down" team of police officers approached 247 Meigs Street, Rayford ran back inside the locked inner door and disappeared up the stairs. *E.g.*, T.195, 264-66. While the other officers engaged in a foot-chase with the suspect, Santell returned to the house and found a cache of drugs and money (including the buy money) hidden under the carpet in the hallway. T.200, 201. When the officers returned, unsuccessful in their attempt to find the suspect, they knocked on the door of apartment number one, located just next to the inside door of the building. Upon entering, they found a letter in the apartment addressed to Rayford. T.267-68. An individual named John Maslyn testified for the prosecution that he knew Rayford personally and

that Rayford lived in the first apartment at 247 Meigs Street. T.180-81

Santell was shown a photographic array shortly after the drug buy which contained a photograph of Rayford. T.239-40. However, he was unable to identify the person who had sold him the cocaine at 247 Meigs Street in the photographic array. T.240-41, 255-56. At the time he was shown the array, Santell said that he "couldn't pick anyone out with 100 percent certainty" and that was why he did not identify anyone. T.255-56.

On November 12, 1998, after viewing a corporeal line-up, Santell identified Rayford as the person who had sold him the drugs T.209-11.[2] Santell admitted that Rayford was the only individual who was in both the photographic array and the line-up. T.241.        The prosecution played an audiotaped recording of the transaction that was alleged to have occurred between Santell and Rayford regarding the cocaine. Santell testified that he recognized his voice on the tape, and identified the other voice as Rayford's.

The jury returned a verdict finding Rayford guilty as charged in the indictment. He was sentenced to an indeterminate term of incarceration of 5 to 10 years. The Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed the judgment of conviction entered in Monroe County Court against Rayford. The New York Court of Appeals denied leave to appeal. Rayford filed a C.P.L. § 440.10 motion for *vacatur* in 2001 in Monroe County Court; this was denied and leave to appeal to the Appellate Division also was denied.

---

[2] The photographs of the line-up depict six black males, all of whom are quite similar appearance. The line-up form indicates that the subjects had dates of birth ranging from January 7, 1956, to January 24, 1971; heights from 6'1" to 6'3"; and weights from 200 to 210 pounds. Despite the differences in the men's chronological ages, all six appear to be in the same general age range. One "filler" had a distinctive scar on his upper chest, but this characteristic was not part of Santell's description or his identification of Rayford. *See* County Court Order Denying Suppression Motion at 1, Respondent's Exhibit ("Resp't Ex.") F at 93; Exhibit K to Petitioner's Second C.P.L. § 440.10 Motion.

In his original habeas petition filed on November 15, 2002, Rayford raised the following three claims which had been raised by his appellate counsel on direct appeal: (1) the verdict was against the weight of the evidence; (2) the line-up identification procedure was unduly suggestive; and (3) the sentence was harsh and excessive. *See* Petition (Docket No. 1). After respondent answered the petition, on May 13, 2004, Rayford sought and ultimately received from the Court (Scott, M.J.) a stay of the proceedings pursuant to *Zarvela v. Artuz* so that he could return to state court to exhaust two claims of ineffective assistance of trial counsel relating to counsel's failure to introduce certain medical records of the petitioner and failed to conduct an audibility hearing and retain a voice analysis expert with regard to a tape-recorded conversation between petitioner and the police officer from whom he was alleged to have purchased the drugs. Magistrate Judge Scott's stay Order contained two conditions–that Rayford commence exhaustion proceedings in state court within 30 days of the Order dated September 24, 2004, granting the stay, and that Rayford return to this Court within 30 days of those proceedings being completed.[3]

At the beginning of March 2008, this Court issued an Order Show to Cause requesting that Rayford provide a status update information as to whether he had completed the exhaustion process. Although Rayford timely responded to orders from the Court, the information he provided makes clear that Rayford has failed to meet the second condition of the stay, which required him to, *sua sponte*, notify the Court that he had completed the exhaustion process. It turns out that the Appellate Division denied leave to appeal in March 2006–meaning that the

---

[3] In the present case, Rayford raised his ineffective assistance claims by means of a collateral motion to vacate the judgment pursuant to C.P.L. § 440.10 in the court that rendered the original conviction–here, Monroe County Court. Exhaustion of a such an application is complete upon the denial of leave to appeal by the Appellate Division.

exhaustion process has been complete for two years, and yet Rayford did not notify the Court of this fact in a timely manner, as he was required to do pursuant to the stay order. Rayford has been on notice since the issuance of the stay order in 2004 that his failure to comply with either of the two conditions of the stay could lead to *vacatur* of the stay order *nunc pro tunc* as of the day the stay was entered, which would lead to dismissal of the Amended Petition if it were not still timely under 28 U.S.C. § 2244(d)(1).

The Court notes with some concern that Rayford failed to take the initiative to notify the Court that he had received a decision from the Appellate Division denying leave to appeal the denial of his C.P.L. § 440.10. This lack of diligence is mitigated, however, by the fact that Rayford has always timely responded to the Court's requests for information regarding the status of his state court exhaustion proceedings. Bearing in mind that Rayford is a *pro se* litigant, the Court allows for the possibility that Rayford may have misunderstood the conditions of the stay order and was waiting for the Court to request another status update from him. In any event, under the present circumstances and in the interest of fairness, I am not going to vacate the stay, notwithstanding Rayford's lack of full compliance with the stay order. Therefore, I have considered all of the claims in the Amended Petition.

For the reasons that follow, I find that none of them warrant habeas relief and deny his petition for a writ.

## DISCUSSION

**Ground One: The verdict was against the weight of the evidence.**

Rayford contends, as he did on direct appeal, that the verdict was against the weight of the evidence because Officer Santell's identification of him was not credible. The Appellate

Division summarily rejected this contention.

As respondent argues, petitioner's claim impermissibly challenges the believability of Officer Santell's ability to identify Rayford attacks the witness' credibility and the weight that the jury should have ascribed to his testimony. *See*, *e.g.*, *Garrett v. Perlman*, 438 F. Supp.2d 467, 470 (S.D.N.Y. 2006) (claim that witness testimony was incredible is not cognizable on federal habeas review because credibility determinations and how much weight to give testimony are within the province of the jury) (quoting *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996) (quotation marks omitted). "Weight of the evidence" claims derive from "C.P.L." § 470.15(5), which permits an appellate court in New York to reverse or modify a conviction where it determines "that a verdict of conviction resulting in a judgment was, in whole or in part, against the weight of the evidence." N.Y. CRIM. PROC. LAW § 470.15(5); *see also People v. Bleakley*, 69 N.Y.2d 490 (1987).

Since weight of the evidence claims are purely a creature of state statutory law, they are not cognizable on habeas review. *See* 28 U.S.C. § 2254(a) (permitting federal habeas corpus review only where the petitioner has alleged that he is in state custody in violation of "the Constitution or a federal law or treaty"); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (habeas corpus review not available to remedy alleged error of state law). Accordingly, Rayford's claim that the guilty verdict was against the weight of the evidence is dismissed as not cognizable in this federal habeas proceeding.

**Ground Two: The identification procedure was unduly suggestive.**

Rayford contends that the corporeal line-up from which Officer Santell identified him as the perpetrator was "[p]rejudicial in that, [sic] there was a large display [sic] in the ages of the

men in the line-up, the only man similar in gae [sic] to the defendant who was in the line-up had a disfiguring scar, and there was a large disparity of height of the individuals in the line-up." Attachment to Petition (Docket No. 1). On direct appeal, the Appellate Division disagreed, noting that "'[t]here is no requirement . . . that a defendant in a lineup be surrounded by people nearly identical in appearance.'" *People v. Rayford* (quoting *People v. Chipp*, 75 N.Y.2d 327, 336 (N.Y.), *cert. denied*, 498 U.S. 833 (1990). The Appellate Division found that "[t]he other five men [in the lineup] resembled defendant, and the differences in their ages and physical characteristics were 'not sufficient to create a substantial likelihood that the defendant would be singled out for identification[.]'" *Id.* (quoting *People v. Chipp*, 75 N.Y.2d at 336; other citations omitted). The Appellate Division's holding with regard to Rayford's claim was neither contrary to, nor an unreasonable application of, *see* 28 U.S.C. §§ 2254(d)(1), (2), the Supreme Court's clearly established Supreme Court precedent on this issue.

In *United States v. Wade*, the Supreme Court recognized that there is a "grave potential for prejudice, intentional or not, in the pretrial lineup, which may not be capable of reconstruction at trial," 388 U.S. 218, 236 (1966), and that to protect a defendant's Sixth Amendment rights the trial court must ascertain prior to trial whether a witness's identification testimony is tainted by an improperly made identification. The two-step inquiry for evaluating whether in-court identification testimony based on out-of-court identification procedures passes constitutional muster requires determining (1) "whether the identification process was impermissibly suggestive and, if so, [(2)] whether it was so suggestive as to raise 'a very substantial likelihood of irreparable misidentification." *Neil v. Biggers*, 409 U.S. 188, 198 (1972) (citing *Simmons v. United States*, 390 U.S. 377, 384 (1968)); *accord, e.g., Jackson v. Fogg*, 589

F.2d 108, 111 (2d Cir.1978). Even if a pretrial identification procedure has been found to be unduly suggestive, the witness' in-court identification testimony nonetheless may be admissible as not violative of due process "so long as the identification possess sufficient aspects of reliability." *Manson v. Brathwaite*, 432 U.S. 98, 106 (1977). In other words, "[i]f the pretrial process was unduly suggestive, the court must then weigh the corrupting effect of the suggestiveness against other factors indicating that the identification may be independently reliable." *Raheem v. Kelly*, 257 F.3d 122, 135 (2d Cir.2001) (internal quotations and citation omitted).

With regard to determining suggestiveness, the Second Circuit has stated that "[a] lineup is unduly suggestive as to a given defendant if he meets the description of the perpetrator previously given by the witness and the other lineup participants obviously do not." *Raheem*, 257 F.3d at 134. "Lineups in which suspects are the only participants wearing distinctive clothing or otherwise matching important elements of the description provided by the victim have been severely criticized as substantially increasing the dangers of misidentification." *Id.* (quotation marks and citation omitted). The Supreme Court has never held that the constitution requires that the defendant and the "fillers" in a line-up look nearly alike. *See United States v. Reid*, 517 F.2d 953, 965 n.15 (2d Cir.1975) (noting that there is no requirement that "in line-ups the accused must be surrounded by persons nearly identical in appearance."); *accord*, *e.g.*, *Douglas v. Portuondo*, 232 F. Supp.2d 106, 112 (S.D.N.Y.2002); *Roberson v. McGinnis*, No. 99-CV-9751, 2000 WL 378029, at *7 (S.D.N.Y. April 11, 2000); *Roldan v. Artuz*, 78 F. Supp.2d 260, 271 (S.D.N.Y.1999); (citations omitted). Rather, "a reasonable effort to harmonize the line-up is normally all that is required" to satisfy due process concerns. *Id.*

The record in this case includes a photograph of the corporeal lineup that Rayford asserts was unduly suggestive. *See* Resp't Ex. F at 56-57. The Court has examined this photograph and finds no basis to conclude that the lineup represents an objectively unreasonable application of the principles articulated by the Supreme Court in *Biggers* and *Wade*, and discussed by the Second Circuit in *Raheem*. The Court agrees with the trial court's conclusion that "[d]espite the differences in ages, all the individuals in the lineup appear to be in the same age range." County Court Order at 1, Resp't Ex. F at 93. I further agree that the fact that one filler had a "distinctive mark on his upper chest," *id.*, did not taint the line-up by impliedly eliminating that filler as a potential suspect. As the trial court found, "this [characteristic, or lack thereof] played no part in the identification of the defendant[,]" *id.*  It cannot be said, on the record before this Court, that Rayford "meets the description of the perpetrator previously given by the witness and the other lineup participants obviously do not." *Raheem*, 257 F.3d at 134; *see also Douglas*, 232 F. Supp.2d at 112 (citing *Raheem*, 257 F.3d at 134; *Frazier*, 187 F.Supp.2d at 110; *Solomon v. Smith*, 645 F.2d 1179, 1183-84 (2d Cir.1981) (pretrial identification deemed unduly suggestive where defendant, five feet six inches tall and 130 pounds, was the only participant resembling witness description; other participants were three to five inches taller or 50 pounds heavier)).

Because Rayford has failed to show an undue suggestiveness in the composition of the line-up presented to Officer Santell, I need not and do not consider the independent reliability of the identification, which is the second prong of the *Wade*/*Biggers*. In sum, Rayford's claim regarding the identification procedure does not provide a basis for habeas relief.

**Ground Three: The sentence was harsh and excessive.**

Rayford contends that his indeterminate sentence of 5 to 10 years was harsh and

excessive given his troubled childhood and unstable family structure. The Appellate Division rejected this claim.

Rayford's challenge to the terms of his concurrent sentences fails to present a constitutional claim cognizable on federal habeas review because the sentences he received were within the statutory range given the crimes he committed together with his status as a second felony offender, the legality of which he does not question. *See White v. Keane*, 969 F.2d 1381, 1383 (2d Cir.1992) ("No federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law.") (citing *Underwood v. Kelly*, 692 F. Supp. 146 (E.D.N.Y.1988), *aff'd mem.*, 875 F.2d 857 (2d Cir.1989)); *see also Fielding v. LeFevre*, 548 F.2d 1102, 1109 (2d Cir.1977). Rayford's claim that his sentence was unduly harsh therefore must be dismissed. *Accord*, *e.g.*, *Charles v. Fisher*, 516 F. Supp.2d 210, 224 (E.D.N.Y. 2007) (holding that petitioner's claim that his sentence was unduly harsh was not reviewable in this habeas proceeding because his sentences fall within the ranges prescribed by New York's Penal Law).

**Ground Four: Trial counsel was ineffective in failing to introduce petitioner's medical records.**

Rayford contends that his "right to effective assistance of counsel was violated when trial counsel failed to introduce the defendant's medical record that contains exculpatory information . . . ." Pet'r Mem. at 11. As Rayford notes, a defendant's Sixth Amendment right to the effective asssistance of counsel at trial is violated when "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To prevail on an ineffectiveness

claim, a defendant must show that his attorney's performance fell "below an objective standard of reasonableness" and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome." *Id.* Thus, "the question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Id.* at 695.

Rayford has attached the medical records in question to his second motion in state court for C.P.L. § 440.10 relief, a copy of which he has provided to this Court. The medical records reveal that in 1976, Rayford suffered a gunshot wound to his left anterior thigh which left an exit wound in his left posterior thigh caused nerve damage resulting in an abnormal gait with a left-foot drop. The records indicate that in June and July of 1999, he received physical therapy for an "unstable left knee and leg" and "atrophy of the quadriceps and hamstring. muscles." It appears that in sometime in the fall of 1999, Rayford was fitted with a plastic leg brace for his left leg. It is unclear whether or not he had a brace, or any other type of orthopedic device, at the time of the the drug sale encounter with Officer Santell.

The Court does not agree that if trial counsel had introduced the proffered medical records, there is a reasonable probability that the jury would have found a reasonable doubt as to whether Rayford sold the drugs to Officer Santell. First, all of the medical records appear to post-date the drug sale on September 3, 1998, for which Rayford was convicted. This fact alone renders moot any argument that the medical evidence is relevant to his claim of ineffective assistance of counsel.  However, even assuming, arguendo, that the medical records were relevant, none of the records "specifically addressed defendant's physical abilities to run or scale

a fence while under the influence of adrenalin," making it "difficult to see how they would even be relevant to his case, let alone be of such importance to the issue of guilt or innocence as to render counsel's representation of defendant non-meaningful . . . ." County Court Order Denying First C.P.L. § 440.10 Motion at 3-4, Resp't Ex. H at 117-18. In an attempt to remedy this defect, Rayford also has submitted two letters from Sylvia K. Scott Carter, RN, CS, ANP, dated October 29, 2002, and July 10, 2003, respectively. These apparently were written in response to a request from Rayford. In the first, Nurse Carter writes,

> The doctor I work with wanted to see your record before I responded. It does not state much. It does confirm the fact that you have left foot drop due to a gunshot wound to your left thigh. Dr. Shrivastava, the Associate Medical Director Health Care for the Homeless (HCH), agrees with me that it would be almost an impossibility for you to outrun any one. If you were wearing a shoe that accommodated your brace, that might be a possibility. As I know and your record staes, you did not have the extra depth shoes . . . [which were prescribed] on 8-12-99.

In the second letter, written in July 2003, Nurse Carter indicates that she is "willing to send a statement or testify on your behalf." She continues,

> It would be a near impossibility for you to have out run four (4) police officers or anyone else in good health, by running up 4 flights of stairs, climbing an additional 18 steps and going through the obstacle course detailed in your letter, ending with running across a yard and over a fence. Your foot drop would not have allowed you to successfully participate in such activities.

First and foremost, a review of the trial record reveals a major discrepancy between the "facts" provided by Rayford and on which Nurse Carter based her opinion, and what the suspect actually would have encountered when trying to evade the police on the night in question. For instance, it appears that the suspect had to run up, at most, two flights of stairs–not four flights of stairs followed by an additional eighteen steps. Second, assuming for the sake of argument that Nurse

-12-

Carter would have been willing to proffer such an opinion at Rayford's trial, there is no indication that Rayford ever informed counsel, prior to trial, of her existence or that she might have potentially relevant testimony to give. The medical records, which were provided to defense counsel prior to trial, would not have alerted him to Nurse Carter as a potential witness. And, there is no mention therein of Rayford having received medical treatment at the healthcare clinic at which she worked. It would be unreasonable to fault trial counsel under these circumstances.

Finally, Nurse Carter's opinion about Rayford's physical abilities would not have exonerated him, as he claims. As noted above, such was arguably pertinent to the circumstances of his arrest, but of only collateral import to the question of his guilt. As the trial court noted, the relevance of medical records generally indicating that Rayford had muscle weakness and nerve damage is made "more questionable given the fact that defendant's running and fence-scaling abilities obviously relate only to his arrest . . . and not to the merits of whether he possessed and/or sold cocaine to the undercover officer as charged in the indictment." *Id.* at 4, Resp't Ex. H at 118.

**Ground Five: Trial counsel was ineffective in failing to retain a voice-recognition expert.**

At trial, the prosecution played for the jury an audiotaped recording of what was picked up on the body wire worn by the undercover police officer during the drug buy. Officer Santell, the undercover officer, testified at trial that he recognized the two voices on the tape as his and petitioner's. However, based upon defense counsel's objection, the transcript of the tape was not admitted into evidence.

Rayford contends that it was trial counsel's "obligation to [have] procured the assistance

of an expert and to show the juror [sic] that the voice on the audio tape was not the Defendant [sic]." Rayford states that "from the beginning" he had "told trial counsel that they have [sic] gotten the wrong man, and that the person on the audio tape was not his voice, but trial counsel selected [sic] not to do anything nor procure the assistance [of] an expert in voice comparison analysis."

The decision whether to call an expert witness at trial generally falls within the realm of strategic choices that should not be second-guessed by a court on review. *See United States v. Kirsch*, 54 F.3d 1062, 1072 (2d Cir.) (finding that trial counsel's decision not to call fingerprint expert "was plainly a tactical decision and hardly bespeaks professional incompetence" ), *cert. denied*, 516 U.S. 927 (1995). Despite his claim that his trial counsel was ineffective for failing to retain an expert, Rayford has provided no reason to believe that the defense would have been able to find an expert witness who would have testified as Rayford hoped. The affidavit signed by the inmate law assistant that in his opinion as a layperson, the voice on the audiotape is not Rayford's is insufficient to make this Court question trial counsel's judgment in this regard. Under the circumstances here, it was clearly a reasonable strategic decision for trial counsel not to have pursued retention of an expert witness in voice recognition. Moreover, trial counsel's handling of the audiotape was competent and demonstrates that he had a well thought out strategy. The prosecutor admitted during her opening statement that the jurors were "not going to hear any testimony from any witness saying that they have done any kind of voice comparison analysis and that the voice on that tape is Terrance Rayford's voice . . . ." T.174. Defense counsel was able to use this to defendant's advantage in a pointed argument set at undermining the strength of the prosecution's proof and calling into question the quality of the police work.

Counsel asked the jury during his closing statement,

> And what about the audiotape? I asked him [Officer Santell], well, you know, did you ask that any type of voice analysis be performed on it, and he said, no, I didn't. And he said, in response to my questions and Ms. Chase's that, you know, he's heard of that being done, but he's never seen it done in Rochester. Well, what kind of answer is that? I mean, would you be satisfied if in a rape case they said, well, we heard of DNA evidence, but we don't do that here in Rochester?

T.337.

Moreover, to the extent that Rayford faults trial counsel for not seeking to preclude Officer Santell from offering his opinion as to the identify of the voices on the tape, I note that testimony concerning voice recognition by a witness who has familiarity with the voice of another is accepted as admissible lay opinion evidence, and as such goes to issues of weight, not admissibility. *See*, *e.g.*, *United States v. Sansone*, 231 F.2d 887, 890-91 (2d Cir. 1956). Defense counsel's strategy with regard to the audiotape was a well-chosen one, given that there was no colorable basis on which to object to Officer Santell's lay opinion testimony about the voices on the tape. Defense counsel properly kept the focus on the crux of the prosecution's case–Officer Santell's *visual* identification of Rayford during the drug buy–not the identification of the voices on the audiotape. As a result, there is no basis for concluding that there is a reasonable probability of a different outcome had defense counsel attempted to retain an expert in voice recognition.

## CONCLUSION

For the foregoing reasons, Terrance Rayford's petition for a writ of habeas corpus is denied and the petition is dismissed. No certificate of appealability shall issue as Rayford has not made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c).

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: April 4, 2008
        Buffalo, New York.